THE PEOPLE OF THE STATE OF NEW YORK, Respondent,.
*v.* SAMUEL A. WAYMAN, Appellant.

*Court of Appeals, June 9, 1891.*

1. *Appeal. New trial.*—In determining whether a new trial should be·
granted, under section 528 of the Code of Criminal Procedure, it is not
the province of the court of appeals to review and determine contro-
verted questions of fact arising upon conflicting evidence.
2. *Same. Evidence.*—The erroneous admission of evidence, which had no·
important effect upon the result, does not authorize a new trial in a.
criminal action.
3. *Trial. Charge.*—The trial court may refuse to embody the language of
an elementary writer in a charge to the jury.
4. *Evidence. Accomplice.*—The corroborative evidence required must be
such as tends to connect the accused with the commission of the.
crime.
5. *Same.*—The jury in this case were held justified in finding that the evi-
dence of the accomplice was sufficiently corroborated.

Appeal from judgment of the court of oyer and terminer
of Livingston county convicting defendant of the crime of
murder.

*George P. Coyne*, for appellant.

*George W. Daggett*, for respondent.

RUGER, Ch. J.—The defendant was indicted at the Living-
ston county oyer and terminer in May, 1890, jointly with
Nelson Swartz for the crime of murder in the first degree, in
killing one Emory Thayer, at Avon, Livingston county, by
shooting him with a pistol, on October 27, 1885, while the
defendants were engaged in the perpetration of the crime of
burglary in the house of said Thayer. Before the trial,.
upon the request of Swartz, the court ordered the defendants
to be separately tried, and thereupon the district attorney
moved the trial of the defendant Wayman. The jury found

the defendant guilty of the crime charged, and he appeals. from the judgment of conviction to this court.

The principal ground urged by him for a reversal of the judgment is that the verdict is against the weight of evidence, and that, under the provisions of the Code of Criminal Procedure, as amended by chap. 493 of the Laws of 1887, authorizing this court to grant a new trial if it is satisfied that the verdict was against the weight of evidence, or against law, or that justice requires a new trial, whether exceptions shall have been taken or not in the court below, he should have a new trial.

This act has been the subject of consideration in this court in several cases, and especially in the Cignarale case, 110 N. Y. 23 ; 16 N. Y. State Rep. 155, where the rule was laid down that in " determining whether a new trial should be granted under the statute, it is not the province of this court to review and determine controverted questions of fact arising upon conflicting evidence. The jury is the ultimate tribunal in such a case and with its decision the court may not interfere, unless it reaches the conclusion that injustice has probably been done."

The decision of the case therefore requires that we should examine the evidence given on the trial. There was no dispute as to the fact that Emory Thayer was murdered at about twelve o'clock on the night of October 27, 1885, in his house in the town of Avon, Livingston county, by a ball from a pistol discharged by one of two men who were then engaged in the perpetration of a burglary in such house. The pistol was discharged by the tallest man of the two, and he fired twice, hitting Thayer both times, first in the arm, and the second time in the abdomen ; the latter being the fatal shot. Neither can there be any question on the evidence, but that the shorter of the two men engaged in the burglary was Nelson Swartz ; and the principal question in the case is, whether Wayman was sufficiently identified as being the man in company with Swartz on that occasion.

There was direct and positive evidence that the defendant was that person by two eye-witnesses of the transaction and by others to whom he had made express admissions that he fired the pistol by which the murder was effected or declarations tending to prove the same fact.  The question, therefore, which was left to the jury did not depend upon circumstantial evidence, or altogether upon the defendant's confessions; but to a large degree upon the credit which the jury might give to the positive evidence adduced on the trial of the case against the defendant.  The credibility of the witnesses was peculiarly for the consideration of the jury.  There were, undoubtedly, circumstances proved which tended, in some degree, to impair the credit of two of the principal witnesses for the prosecution, but there was considerable evidence from other sources of such a character as afforded corroboration of the truth of the testimony given by them.  Swartz, the co-defendant, and accomplice of the accused, became a witness for the people on the trial, and gave positive evidence of the fact that Wayman accompanied him to the house of Thayer at the time the crime was committed, and fired both shots with the pistol by which the death of Thayer was accomplished.  He testified, substantially, that Wayman told him in July, 1885, that he was going out north to work and should make a pull somewhere that fall, and when he got ready he would let him know; that in the forepart of October, he received a letter from Wayman advising him that he was working at Potter's for two dollars a day, and wanted Swartz and Kuhn to meet him at Lakeville, near Kimbark's Hotel, on the night of the 27th of October.  Swartz also testified that he made an arrangement with Kuhn to meet him at a designated place on that night, but that Kuhn failed to keep the appointment, and did not join him; that he started alone from his own house on the 27th and walked from there to his father's, about six miles distant, where he arrived about sundown; that he then borrowed his father's horse and wagon and drove about

twenty miles to Lakeville, where he met Wayman in the high-way near Kimbark's Hotel. That then, Wayman having got into the wagon, they drove to Thayer's house, where, after disguising their faces with handkerchiefs, they forced up a window in the sitting-room and entered the house; that soon after entering, the family were aroused by Mrs. Thayer's screams and Thayer got out of bed and came forward and became engaged in a scuffle with Wayman, which resulted in Wayman's shooting him with a pistol twice. Immediately after this they escaped, Swartz entering the wagon alone and returning to his father's with the horse and wagon and Wayman pursuing his own course. While in the house and in the act of escaping Swartz accidentally dropped his pistol and was unable to recover it.

This evidence having been given by an accomplice in the crime, required corroboration before a jury were authorized to give it credit, for the law does not permit a person to be convicted of a capital offence upon the evidence of an accomplice alone. This corroborative evidence must be such as tends to connect the accused with the commission of the crime.

It is claimed that the evidence of Swartz was corroborated in some of its features by the undisputed proof that a pistol, identified as belonging to Swartz, was found immediately after the murder in the room adjoining that in which the crime was committed with all of its barrels loaded, except one, which had not recently been discharged. This evidence tended to establish the fact that Swartz was present at the time of the crime, and, presumptively, that he did not fire the shots which effected the death of Thayer. It was also shown that Swartz left his father's house, a place about twenty miles distant from Thayer's farm, on an evening in the latter part of October, with a horse and wagon borrowed from his father, and did not return until daylight of the succeeding morning, when the horse appeared to have been driven very hard.

It appeared from Wayman's evidence and admissions, that he was a brother-in-law of Swartz and that they had, during the years 1884 and 1885, been associated together, and had been accomplices in the commission of several burglaries and other crimes in the vicinity where this crime was committed. Wayman was a tall man and Swartz comparatively short, and the difference in their sizes and figures was quite apparent. Wayman and Swartz were both young men residing in Springwater, Livingston county, engaged in agricultural pursuits and accustomed to work by the day and at odd jobs, as they needed money or could get employment. Wayman shortly previous to the murder was shown to be in possession of a pistol, brass knuckles and a sling shot, which he exhibited to his associates at Holley in Orleans county. After Wayman was indicted for murdering Thayer and arrested, he was imprisoned in the county jail of Livingston county for several months, where he became acquainted and intimate with one Salisbury, with whom he had frequent conversations and to whom, as Salisbury testifies, he made confessions directly implicating himself in the commission of the crime. Salisbury was a young man, a resident of a distant county and a stranger to the people in that part of the country, and was in jail under a commitment for the crimes of burglary and larceny. It appears, from his evidence, that Wayman made a confidant of him and disclosed the circumstances by which he was surrounded and the difficulties which apparently stood in the way of making a successful defense to the charge made against him. He told him that he was indicted with another man named Swartz for murder, and that Swartz was the only man he was afraid of swearing against him; that he, Wayman, was working for a man by the name of Sheldon in Orleans county when the murder was committed, and left Sheldon's house on the morning of the 27th of October and went to Rochester and from there to Livonia and Lakeville, where he met Swartz with a wagon; that they rode together to Thayer's and got into the house; that the woman of the

house discovered them and hallooed to her husband, who then appeared on the scene and had a clinch with Wayman; that after a struggle Wayman shot Thayer in the arm, and that not inducing him to let go, he shot him again, and they then escaped from the house; that he, Wayman, jumped a freight train and got back to Rochester, from whence he returned to Sheldon's on the morning following the murder, and the same day was paid a small sum of money by his employer Sheldon.

He further stated that the way he came to meet Swartz was that he wrote to Swartz requesting a meeting with him at Lakeville. He asked Salisbury what he should do about that letter, saying that it didn't contain anything about the murder and only requested Swartz to meet him at Lakeville. He thought he could explain the letter by saying that he wanted to meet Swartz to go fishing or hunting. It was shown that while imprisoned in the jail, Wayman made several persistent but unsucessful efforts to secure a private interview with Swartz, and endeavored to open clandestine communications with him. He attempted ineffectually to send a message to Swartz, asking " if he had squealed on the Thayer murder and was a going to plead guilty to it; " but succeeded in privately sending him a book, in which he had written the sentence; " We are not guilty, so stand firm." While in jail Wayman made several unsuccessful attempts to escape.

The evidence of Swartz was further corroborated by the testimony of Mrs. Thayer, who testified that she was awakened in the night of October 27, 1885, at nearly 12 o'clock, by hearing some one in the sitting room of their house, and called out, " What do you want? " A man then sprang through the bed room door, and pointing a revolver at her head, threatened, if she moved or stirred, to blow her head off. She screamed " murder," and upon that Mr. Thayer got out of bed, and said : " You devil, what are you doing here ? " He immediately clinched the man, and

after a struggle, backed him against the clothes press door, when the burglar discharged a pistol at him. Mr. Thayer then forced him through the sitting-room door, and called out again : " You devil, what are you doing here ? " and the burglar then shot again. There was a light in the sitting room, and Mrs. Thayer plainly saw the burglars and describes the man engaged in the struggle as a tall, active man, with dark clothes, with his face partially disguised by a veil or similar contrivance. She also saw the other man as he was escaping from the dining-room, and describes him as the shorter man of the two, but with his face also disguised. She swears that they respectively compared well, as to size, with Wayman and Swartz.

The evidence of this witness, while not as explicit or clear on the question of indentity as it might have been, except for the disguise worn by the men, yet, so far as it goes, tends to show that the parties committing the crime resembled, as to size, form and dress, those who were implicated by the testimony of Swartz.

One Kuhn also gave evidence of declaration and actions on the part of Wayman, tending to implicate him in the commission of the murder. It was also proved that the balls found in the arm and body of Thayer after his death were discharged from a central fire pistol of 32-100 calibre, and that the pistol owned by Wayman at the time of the murder was of that character.

We have not referred to all of the circumstances produced in evidence against the defendant; but have aimed to describe the more important features, with a view of showing the character of the proof by which the People claim to have corroborated Swartz, the accomplice. If the witnesses for the people are to be believed, there was, undoubtedly, sufficient proof, aside from the evidence of Swartz, to support a verdict of guilty against the defendant. We can regard the message, admittedly sent to Swartz by the defendant, that " we are not guilty, so stand firm," as an

implied admission of the defendant's complicity in the events of October 27th, whatever they may have been. He voluntarily associated himself with Swartz in the transactions of that night and affirms not only his own innocence, but also that of Swartz. How could he be supposed to have any knowledge of Swartz's innocence, except from the fact that it depended, as well as his own, upon events known to both of the parties. This is also confirmed by his message to Swartz asking him if he was "agoing to squeal on the Thayer murder and plead guilty." The implication from this message that Swartz was connected with the murder, to Wayman's knowledge, is irresistible. How could he plead guilty to an offense of which he was innocent, or confess a crime that he did not commit?

It was within the province of the jury to give full credit to the testimony of Salisbury which afforded ample corroboration to the evidence of Swartz, if believed. While there were circumstances affecting his moral character, which somewhat impaired the force of his testimony, yet there was intrinsic evidence of its truthfulness, which must have added considerable weight to its probability in the minds of the jury. His knowledge of the fact that Wayman received a payment of money from his employer Sheldon at Holley on the day after the murder, could hardly have come to his knowledge except through information derived from Wayman.

And so, too, the knowledge of the method by which Wayman reached Lakeville from Holley, and there met Swartz, and was carried by Swartz from Lakeville to Thayer's house; and the detail of the circumstances attending the commission of the murder could not, naturally, have come to his knowledge, except from the lips of a participator in the transaction. Salisbury was a stranger to all the parties concerned in this crime, apparently, until after he was imprisoned in the Livingston county jail, and while there he had no apparent intercourse with, or knowledge of Swartz

32

or any of his associates except Wayman. He was in close confinement from that time until he was sworn on the trial as a witness and had no apparent opportunity of communicating with those who might have known the circumstances related by him. Some of these facts were never made public until the trial of Wayman took place, and, presumptively, could not have been communicated to him previously, except by an actor in the crime. It is difficult to overestimate the force which these circumstances lend to the evidence of Salisbury, and we are not surprised that the jury gave it credit, notwithstanding the discredit which the lack of moral character in its relator cast upon it.

The defendant was sworn in his own behalf as a witness, and denied, substantially, all of the statements made by Swartz or Salisbury implicating him in the commission of the crime. He testified that on the night of the murder he stayed at the house of one Sheldon in Holley, Orleans county, a distance of some fifty miles from Avon, Livingston county. He denied that he was with Swartz on that night; that he was present on the occasion of the murder of Thayer; that he was ever at Livonia, or Lakeville, or that he knew Thayer. While admitting that he corresponded with Swartz, he denied that he wrote Swartz to meet him at Lakeville on the 27th of October, 1885, or that he did meet him there on that date. Wayman testified that Sheldon paid him money on the 28th of October, 1885.

There can be no question, on the evidence, but that the defendant did work in Orleans county for Sheldon in the month of October, both before and after the 27th of that month, and was at Sheldon's house some time on the 28th day of October and received a small payment of money from him on that day. The witnesses from Orleans county who were called to corroborate Wayman's evidence, of whom there were several, failed to identify the particular days on which they saw him in that county and added nothing to the force of his own evidence. The case, therefore, presented, sub-

stantially, a conflict between the unsupported evidence of Wayman, on one side, and that adduced by the People on the other. We are not prepared to say that the jury erred in disposing of the question presented, or that any such injustice has been done the defendant in the result of the case on the facts as requires us to grant a new trial.

The exceptions taken to the admission and exclusion of evidence and to the judge's charge are, generally, quite unimportant and require but little consideration.

The defendant's counsel read a section from Greenleaf on Evidence in respect to the weight to be given to proof by parol admissions, and requested the court to charge the jury in the language there employed. While the work referred to is, undoubtedly, one of high reputation and entitled to great weight in the consideration of questions of evidence, it is not error for a court to refuse to embody the language of an elementary writer in a charge to the jury. The language used by the author might not have been improper, but the judge must be left to select the words in which he chooses to express his views of the law to the jury, and unless he lays down incorrect propositions or refuses to instruct them as to pertinent, material and necessary points, called for by the circumstances of the case, he does not commit any error calling for the intervention of an appellate court. We think the judge said all on the subject of evidence by admissions which the nature of the case required.

It is also claimed that error was committed by the trial judge in permitting the witness Swartz to state the contents of the letter received by him from Wayman, which had been destroyed. Swartz had testified that he was unable to read writing and was informed of the contents of the letter by another who read it to him. His knowledge on the subject was therefore apparently hearsay and presumptively inadmissible. The case, however, is peculiar and the authorship and contents of the letter are confirmed by many circumstances aside from the evidence of Swartz.

It was testified by Wayman that when he started for Holley he promised to communicate with Swartz if he found work for him to do, and that he did write to him from that place about the time this letter was received by Swartz. There was also proof that Wayman admitted that he wrote a letter to Swartz requesting a meeting with him at Lakeville, but claimed that there was nothing in the letter referring to the murder.

Whatever question, therefore, there may be about the admissibility of this evidence it may be obviated by considering the effect which it probably had upon the result of the case. The evidence was undoubtedly relevant and proper to be taken into consideration with the other proof in the case.

There was nothing in the contents of the letter, as testified to by Swartz, bearing upon the circumstances of the crime and it was material only as affording support to Swartz's testimony that he did meet Wayman on the day in question. This was a collateral circumstance and the case would not have been materially impaired if the evidence objected to had been stricken from the case.

In view of these circumstances and the strength of the case against the defendant we think the erroneous admission of Swartz's evidence as to the contents of the letter had no important effect upon the result of the trial and authorizes us to decline to grant a new trial under the provision of § 542 of the Code of Criminal Procedure for this reason.

There seems to be no other exception of sufficient importance to merit discussion.

The judgment should, therefore, be affirmed.

All concur, except ANDREWS, J., not voting, and GRAY, J., absent.

NOTE.

Upon the question of new trial under section 528 of the Code of Civil Procedure, see People *v.* Kelly, 113 N. Y. 647; People *v.* Greenwall, 115 Id. 520; People *v.* Fish, 125 Id. 136; People *v.* Trezza; People *ex rel.* Trezza